Lupien v. First Federal Savings & Loan Association.

conviction of Ginzburg. The establishment by this court of such a dividing line is a curious application of the *Memoirs* case holding. If we seek an answer to the nature of the book, how it was advertised prior to the magic date is equally pertinent to that determination as the manner in which it has been advertised since.

---

ALBERT J. LUPIEN *vs.* FIRST FEDERAL SAVINGS AND
LOAN ASSOCIATION OF LOWELL.

Middlesex.    March 8, May 23, 1966. — July 11, 1966.

Present: WILKINS, C.J., SPALDING, CUTTER, SPIEGEL, & REARDON, JJ.

*Equity Pleading and Practice,* Master: findings; Decree. *Contract,* For land development.

A master's report confirmed by an interlocutory decree from which no appeal was taken established the facts in a suit in equity, and it was the duty of the judge and of this court on appeal to see that the proper decree was entered on those facts. [314]

With certain modifications this court affirmed a final decree in a suit in equity adjusting financial matters between the parties following a right-

ful termination by the defendant of a contract between them for land development. [315]

BILL IN EQUITY filed in the Superior Court on June 25, 1963.

The suit was heard on a master's report by *Fairhurst, J.*

*Eugene L. Tougas* for the plaintiff.

*Carlton W. Spencer (George G. Pierce* with him) for the defendant.

REARDON, J. This is an appeal from a final decree entered in favor of the defendant (the bank) upon a bill in equity brought by the plaintiff to compel the bank to convey certain real estate to him and to pay damages. The bank filed a counterclaim asserting indebtedness of the plaintiff to the bank. The plaintiff answered to the counterclaim and petitioned in set-off seeking an accounting. He alleged in his answer that the bank had waived certain terms of an agreement between the parties and had engaged in misrepresentations which damaged the plaintiff. The case was referred to a master who found that the plaintiff was in default and that there was no impropriety on the part of the bank in terminating the agreement.

In 1960, the plaintiff conveyed the land involved to certain persons, taking a second mortgage. The bank lent money to those same persons under terms of a construction mortgage. In January, 1962, the bank foreclosed, and on March 29, 1962, "[i]n an effort by both . . . [the plaintiff] and . . . [the bank] to salvage their respective financial and security interests in the land," an agreement was made. Under the agreement the bank was to sell the plaintiff certain lots, "some vacant, some with houses substantially completed, and some where construction was partly completed," hereafter called the locus. The plaintiff was to pay $533,561.36 by April 30, 1965, plus such advances as the bank would make to him from time to time. On the sum to be repaid six per cent accumulated interest per annum was also to be paid, beginning May 1, 1962. The plaintiff agreed to complete the partially constructed houses in accordance with the plans and specifications of the bank and subject to its approval by October 15, 1962. The plain-

tiff further agreed to assume and pay all real estate taxes, water charges, and insurance costs from January of 1962, and to exert his best efforts to sell the houses on terms that were approved by the bank. The proceeds from the sale of the houses were to be turned over to the bank to be applied to the contract balance of $533,561.36 after subtracting a reasonable real estate broker's commission and a sum not to exceed five per cent of each sale price to be paid to the plaintiff for his services. Time was agreed to be of the essence of the contract.

"Sometime about" May of 1962, the plaintiff informed the bank that he was unable to make the required payments for the insurance, water, and taxes. The bank stated that the bills had to be paid and that it would make the payments. The plaintiff submitted bills for construction expenses to the bank and all such bills were paid by the bank. At no time was any work done on the houses disapproved. On October 15, 1962, however, the plaintiff had not completed the work on the houses. About the end of May, 1963, the plaintiff requested the bank to write additional construction mortgages for vacant lots in the locus. The bank refused and, on June 5, 1963, wrote to the plaintiff that he had until June 12, 1963, to submit for confirmation the sale agreements for at least seventy per cent of the vacant lots in the locus. The plaintiff was unable to submit such sale agreements and on June 20, 1963, in the manner prescribed in the agreement, the bank informed the plaintiff that it had terminated the agreement because of his failure to comply with its terms. On June 25, 1963, the plaintiff brought this suit. Following its commencement several of the lots in the locus were conveyed by the bank to purchasers obtained through the efforts of the plaintiff or his brokers. On the sales after the commencement of the action, the bank paid the broker's commission and paid into court an amount equal to five per cent of the purchase prices. The master found that the plaintiff had exerted his best efforts to sell the houses as required by the agreement, that there had been no waiver of the agreement's terms by the bank, and that the bank had made no misrepre-

sentations. In his findings the master stated that some of the houses on the locus had been rented during the period the agreement was in force and the rents paid to the bank. The evidence was not reported by the master. There was no appeal from the interlocutory decree confirming the master's report.

The final decree, entered on the basis of the master's report, adjudged that the plaintiff had failed to comply with the terms of the agreement; that he had no interest in the locus; that he owed the bank: (a) $24,411.84 for water, insurance, and tax bills paid by the bank, and (b) $39,928.75 for interest due under the March 29, 1962, agreement from the date of the agreement until June 20, 1963, when it was terminated; and that the plaintiff was entitled to five per cent of the purchase prices on the houses sold after commencement of this proceeding but that those monies, $19,505.75, were to be paid directly to the bank in partial satisfaction of the plaintiff's debt. The plaintiff's bill of complaint and his petition in set-off were dismissed.

1. As the case reached us there did not appear to be facts in the record sufficient to substantiate certain of the contract balance adjustments allowed by the master and reflected in the final decree. As a result we issued an order for amplification of the record and there then came to us exhibit 13A, to which reference had been made in the final decree. This exhibit is a series of statements of account setting forth the contract balances due under the agreement to the bank from time to time.

2. There having been no appeal from the interlocutory decree confirming the master's report, the master's findings "became conclusive between the parties." *Tucker* v. *Poch,* 321 Mass. 321, 322. *Perry* v. *Oliver,* 317 Mass. 538. *Wrentham Co.* v. *Cann,* 345 Mass. 737, 741. See *Boston Consol. Gas Co.* v. *Department of Pub. Util.* 329 Mass. 124, 128. "The report contains facts sufficient to support a final decree. . . . With the case in that posture it is our duty, as it was the duty of the judge, to see that a proper final decree is entered on the facts found." *Wrentham Co.* v.

*Cann,* 345 Mass. 737, 741.   See *Dodge* v. *Anna Jaques Hosp.*
301 Mass. 431, 435.

An examination of exhibit 13A indicates that there are
no inconsistencies between the final decree and the subsidi-
ary facts found by the master except for a charge to the
plaintiff of $1,274.84 for taxes for the year 1960 for which
he was not responsible.   The amplification of the record
further indicates that the items of $24,411.84 and $39,928.75,
which were adjudged in the final decree to be due the
defendant for insurance, taxes, water, and interest from
May 1, 1962, until June 20, 1963, were reflected in and made
a part of the contract balances set out in the master's re-
port.[1]   Thus the amplification of the record indicates that
the final decree should be amended only to allow the plain-
tiff a credit against the $24,411.84 for the 1960 taxes in the
amount of $1,274.84, which was erroneously debited to the
contract balance.[2]   The plaintiff is also entitled to a credit
against the sum of $39,928.75 for the interest charged to
him attributable to the erroneous debit for the 1960 taxes.
The contract balances set forth in exhibit 13A reflected ap-
propriate credits to the plaintiff for all rents received and
removed any question of accounting relative to the rented
houses.

3.   The master's report provided ample basis for that
portion of the final decree relative to the plaintiff's default
on the agreement and the impropriety of an award of dam-
ages to him.

4.   Further, it was within the judge's discretion to order
that the sum of $19,505.75, which had been paid into court
by the bank and which he found to be owed to the plaintiff,
should be paid directly to the bank in partial satisfaction
of his debt.

The decree is to be modified in accordance with the fore-
going and as so modified is affirmed.

*So ordered.*

---

[1] We note that the December 14, 1962, contract balance in the record was
incorrectly printed as $506,070.26 and is corrected in the record amplification
to $596,070.26.

[2] The bank in its brief on appeal waived its claim to this amount.